**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JUL 16 2012

CLERK, US DISTRICT COURT
RICHMOND VA

VIRGINIA POWER ENERGY
MARKETING, INC.,

     Plaintiff,

v.                                    Civil Action No. 3:11cv630

EQT ENERGY, LLC,

     Defendant.


## MEMORANDUM OF LAW

This matter is before the Court on Virginia Power Energy Marketing, Inc.'s ("VPEM") MOTION FOR SUMMARY JUDGMENT AS TO COUNT I (BREACH OF CONTRACT) OF THE AMENDED COMPLAINT (Docket No. 61) and EQT Energy, LLC's ("EQT") MOTION FOR SUMMARY JUDGMENT (Docket No. 67). For the reasons set forth below, EQT's motion will be granted, VPEM's motion will be denied, and VPEM's Amended Complaint will be dismissed with prejudice.


## PROCEDURAL HISTORY

This case originated on September 22, 2011 when VPEM brought an action for damages against EQT, alleging breach of contract (Counts I and II) and promissory estoppel (Count III) (Docket No. 1). EQT filed its Answer on November 3, 2011 (Docket No. 9) and a Motion to Dismiss Count III For Failure to State a Claim Under

Fed. R. Civ. P. 12(b)(6) (Docket No. 7).   The Court granted the motion to dismiss on December 16, after the parties agreed that there is no cause of action for promissory estoppel under Virginia law.   (Docket No. 19).   Thereafter, VPEM filed an Amended Complaint, amending Count III by asserting a claim that EQT should be estopped from denying the existence of a binding contract, relying on the doctrine of equitable estoppel. Id. ¶¶ 37-39.

EQT filed an answer to the Amended Complaint (Docket No. 25), and a Motion for Judgment on the Pleadings (Docket No. 26).   EQT grounded that motion on a change in federal regulations which it argued made the purported contract between the parties impossible to perform.   EQT's motion was denied on a finding that whether the alleged contract was possible to perform could not be decided as a matter of law.   May 2, 2012 Order (Docket No. 51).   Thereafter, the parties filed cross-motions for summary judgment (Docket Nos. 61 and 67).   Responses and replies were filed, oral argument was heard on June 27, 2012, and these motions are now ripe for decision.[1]

---

[1]   On April 30, 2012, EQT filed a MOTION FOR LEAVE TO FILE AN AMENDED ANSWER AND MEMORANDUM IN SUPPORT (Docket No. 46).   The Court granted that motion on June 6, 2012.   (Docket No. 84). According to EQT's Amended Answer, VPEM unilaterally suspended all commercial dealings with EQT before EQT took the action VPEM alleges constituted anticipatory breach.   Mem. Supp. Motion to Amend at 2-3 (Docket No. 46); Am. Answer (Docket No. 85).   Thus, EQT argues that, in the event the Court finds that the parties had an enforceable contract, VPEM was the first party to breach that

## STATEMENT OF FACTS

The following generally applicable facts are either undisputed or recited giving all favorable inferences to VPEM. Other facts will be recited in the legal analysis to which they are pertinent and those facts also are either not in dispute or recited giving all favorable inferences to VPEM.

The dispute between the parties involves a natural gas pipeline "capacity release." Interstate natural gas pipelines sell "firm capacity" or "the right to inject up to a certain amount of natural gas into the pipeline at designated points and to have that gas 'shipped' to other designated points, where the gas is withdrawn from the pipeline." Briden Expert Rept. at 1. The buyer of "firm capacity" agrees to pay monthly pipeline charges in exchange for their use of a portion of the pipeline. Id. Thus, if a buyer purchases firm capacity that the buyer cannot use, then the buyer may choose to resell the unused capacity, in order to avoid paying these monthly charges. The first buyer is then labeled a "releasing shipper," and the second buyer is labeled a "replacement shipper." Id. at 2.

The Federal Energy Regulatory Commission ("FERC") regulates the sale of firm capacity. 18 C.F.R § 284.8. In general, the releasing shipper is required to notify the pipeline of the terms

contract.  Because the Court finds that the parties did not have an enforceable contract, there is no need to consider the issue.

3

and conditions under which it is releasing capacity, inform other shippers of the release, and allow shippers to bid for the release at an auction. Id. However, a "non-biddable release" is permissible if the replacement shipper agrees to pay the applicable maximum rate for that capacity. Id. The interstate pipeline's FERC Gas Tariff provides the maximum lawful rate. A replacement shipper can also agree in advance to match the highest bid submitted by other shippers. Briden Expert Rept. at 2.

Tennessee Gas Pipeline ("TGP") is an interstate gas pipeline that sells firm capacity. Its pipeline system stretches from the Gulf of Mexico to New England. EQT is a natural gas producer that operates in the Mid-Atlantic and Northeastern United States. In June of 2009, TGP was working on a pipeline expansion project that was to be completed on November 1, 2011. It sought to sell part of its future capacity to EQT. On June 12, 2009, TGP and EQT entered into an Amended and Restated Precedent Agreement ("Precedent Agreement") in which EQT purchased 350,000 dekatherms of firm natural gas transportation service per day on TGP's "300 line," with the actual implementation of the purchase (the "in-service date") to begin upon completion of TGP's expansion project.[2] EQT Mem. Supp. Summ. J. at Exhibit A. The Precedent

---

[2] The validity of the transaction between EQT and TGP is not at issue in this case.

4

Agreement between EQT and TGP provided that it was "subject to [TGP's] FERC Gas Tariff and to all valid laws, orders, rules and regulations of duly constituted governmental authorities having jurisdiction." Id.

Having purchased more capacity than it could use, EQT sought to resell a portion of the capacity it had bought from TGP to other shippers.   In this effort, EQT reached out to VPEM.   VPEM operates out of Richmond, Virginia, is a subsidiary of Dominion Resources, Inc., and is a distributor of natural gas.   Martin Minnaugh, the Director of Market Origination at VPEM, and other employees at VPEM (including in-house counsel), drafted a "Letter of Intent" on April 28, 2011, and sent the draft to Stephen Rafferty, the Senior Vice President of EQT.   VPEM Mem. Supp. Summ. J. at Exhibit 7.   Minnaugh and Rafferty remained the principal negotiators for VPEM and EQT, respectively.   In the April 28 letter, the parties discussed the possibility of EQT releasing to VPEM 75,000 dekatherms per day of the 350,000 dekatherms EQT had purchased from TGP.   Id.   However, EQT was unwilling to release that much capacity.   Rafferty instead proposed a release of 30,000 dekatherms per day.

On June 16, 2011, Minnaugh sent Rafferty a revised "Letter of Intent."   That Letter of Intent was substantially the same as the April 28 letter, with two exceptions.   First, the amount of the

capacity to be released was set at 30,000 dekatherms, pursuant to Rafferty's wishes, and second, the section entitled "Non-Binding Effect" was revised.    VPEM Mem. Supp. Summ. J. at Exhibit 9. Minnaugh signed the letter on June 21, and Mr. Rafferty signed it on June 22.    Am. Complaint at Exhibit 1 (Docket No. 24) (hereinafter "Letter of Intent").

In the Letter of Intent, EQT "propose[d] to release a portion of [the TGP capacity] to VPEM."    EQT could not immediately sell capacity release because TGP's expansion project was ongoing and would not be complete until at least November 1, 2011.[3]    According to EQT, the provisions of the Letter of the Intent show that it was a mere "agreement to agree."    VPEM, on the other hand, contends that the Letter of Intent bound the parties to execute the future transaction contemplated by its terms.    The Letter of Intent contains a merger clause that provides, "[t]his LOI contains the entire agreement of EQT and VPEM with respect to the subject matter contained herein and supersedes any prior or contemporaneous oral or written agreements between the parties relating to the same subject matter . . . no amendment or modification of this LOI shall be effective unless set forth in a writing signed by EQT and VPEM." Letter of Intent ¶ 7.

---

[3]    See Am. Complaint ¶ 14 ("EQT and VPEM could not immediately execute the regulatory documentation to implement performance of the Agreement because TGP's pipeline expansion project was still under construction and not yet in service.").

At the time the Letter of Intent was signed, the maximum applicable rate in TGP's FERC Gas Tariff had not yet been set. VPEM Mem. Opp. Summ. J. at 10. In the Letter of Intent, the parties listed the rate to be paid by VPEM as the lesser of $.84 per dekatherm or "the rate that would be applicable to EQT under the NRLA." Letter of Intent ¶ 2.[4] Because VPEM and EQT contemplated a "non-biddable release," in order to comply with FERC regulations, the rate paid could not be less than the maximum applicable rate. On October 21, 2011, the maximum applicable rate under TGP's FERC Gas Tariff was set at $.88 per dekatherm. Thus, the Letter of Intent could not have been implemented as written. As VPEM explains, the parties either would have had to mutually agree to change $.84 to $.88 in the Letter of Intent or else, EQT would have had to make the capacity release "biddable." In that case, according to VPEM, if VPEM failed to submit the "high bid," EQT would have been free to conduct the transaction with a third party. VPEM Opp. Summ. J. at 14.

Before the change in the maximum applicable rate, but after the Letter of Intent was signed, the value of the TGP capacity that EQT owned increased, due to a change in gas prices. VPEM Mem. Supp. Summ. J. at 13.[5] Rafferty expressed doubts about the

---

[4] The "NLRA" is the Negotiated Rate Letter Agreement between EQT and TGP.

[5] Although this fact and others herein are disputed by EQT, the

contemplated future transaction between EQT and VPEM.   In August of 2011, Rafferty explained that he was receiving higher bids from third parties for the capacity on the TGP 300 Line, and on September 7, EQT requested that VPEM agree to pay an additional $12 million for the capacity release. Id. at 14. VPEM maintained that the parties had a valid, binding contract, and refused to pay EQT more than it had agreed to in the Letter of Intent.   Id. at 50.   On September 20, 2011, Rafferty sent VPEM the following letter:

> This is notification that EQT Energy, LLC's ("EQT") senior management did not approve the Transaction as originally contemplated in the Letter of Intent ("LOI") previously entered into between EQT and Virginia Power Energy Marketing, Inc. ("VPEM"), dated June 16, 2011. Although the parties have been in good faith negotiations during the last three months, EQT and VPEM were unable to promptly draft and execute the documents required to enter into the Transaction.   It is EQT's intent to continue working together to explore business opportunities and develop a mutually acceptable alternative Transaction.

Id. at 15.

Two days after Rafferty's letter was sent, VPEM filed this action.   The foregoing facts form the basic context for the assessment of the parties' cross-motions for summary judgment. Other facts will be outlined in the discussion of the analytical

---

evidence is considered in the light most favorable to VPEM for purposes of summary judgment.

component to which they relate.

## DISCUSSION

### A. Existence of a Contract

VPEM contends that the parties had a valid, binding, enforceable contract. EQT asserts that the Letter of Intent was simply an "agreement to agree."

In order to form a contract in Virginia, there must be "mutuality of contract." Allen v. Aetna Cas. & Sur. Co., 222 Va. 361 (Va. 1981). "There must be mutual assent of the contracting parties to terms reasonably certain under the circumstances. . ." Id. at 364. Each party must "exchange[] promises in which each must be bound to act or refrain from acting." McNeil v. Haley South, Inc., No. 3:10cv192, 2010 U.S. Dist. LEXIS 95658, at *16-17 (E.D. Va. Sept. 13, 2010); 3 North, PLLC v. Corp. of the Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints, No. 3:09cv669, 2009 U.S. Dist. LEXIS 115360, at *9 (E.D. Va. Dec. 10, 2009) ("The base-line requirement for finding the existence of a contract, written, oral, implied, or otherwise, is a showing of mutual assent at the time of the agreement, i.e., the proverbial 'meeting of the minds.'") (citing Hertz Corp. v. Zurich American Ins. Co., 496 F. Supp. 2d 668, 676 (E.D. Va. 2007); Snyder-Falkinham v. Stockburger, 249 Va. 376 (Va. 1995)).

Where there is a condition precedent, such that "'the

contract is made in form, but does not become operative as a contract until some future specified act is performed,' [then] if the condition precedent does not occur, [] the defendant cannot be held liable for failure to perform the contract." Space Tech. Dev. Corp. v. Boeing Co., 209 Fed. Appx. 236, 239 (4th Cir. 2006) (citing Hammond v. Pac. Mut. Life Ins. Co., 159 F. Supp.2d 249, 254 (E.D. Va. 2001); Forrest Creek Assocs. Ltd. v. McLean Sav. & Loan Ass'n, 831 F.2d 1238, 1241 (4th Cir. 1987)).

A letter of intent or any other writing in which the terms of a future transaction or later, more formal agreement are set out is presumed to be an agreement to agree rather than a binding contract. "Calling a document a 'letter of intent' implies, unless circumstances suggest otherwise, that the parties intended it to be a nonbinding expression in contemplation of a future contract." Burbach Broad. Co. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002); see also Boisseau v. Fuller, 30 S.E. 457 (Va. 1898) ("[T]he circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement.") (citations omitted). In Virginia, unlike some other jurisdictions, an agreement to "negotiate open issues in good faith" to reach a "contractual objective within [an] agreed framework" will be construed as an agreement to agree rather than

a valid contract.  <u>Beazer Homes Corp. v. VMIF/Anden Southbridge Venture</u>, 235 F. Supp. 2d 485, 491 (E.D. Va. 2002).

In determining whether there is mutual assent, courts look first to the language of the agreement itself.  <u>Burbach</u>, 278 F.3d at 406; <u>see also</u> <u>W.J. Schafer Assocs., Inc. v. Cordant, Inc.</u>, 493 S.E.2d 512 (Va. 1997); <u>Boisseau v. Fuller</u>, 30 S.E. 457 (Va. 1898). Here, the parties expressly provided in the Letter of Intent that all their representations and negotiations were contained therein, that no prior agreements or negotiations should be considered, and that any future agreement would need to be in writing.[6] The parties agree that the Letter of Intent is unambiguous and that both the question of whether the letter amounted to a contract and the question of the parties' rights and obligations under the letter must be decided as a matter of law.  <u>See, e.g.</u>, <u>Mullins v. Mingo & Lumber Co.</u>, 10 S.E.2d 492, 493 (Va. 1940) ("Once the nature and extent of the[] [parties'] representations has been determined, the question of whether or not a contract was formed is a question of law, and is not within the province of the jury.").

---

[6]   The "LOI contains the entire agreement of EQT and VPEM with respect to the subject matter contained herein and supersedes any prior or contemporaneous oral or written agreements between the parties relating to the same subject matter . . . no amendment or modification of this LOI shall be effective unless set forth in a writing signed by EQT and VPEM." Letter of Intent ¶ 7.

Turning then to the language of the Letter of Intent, and taking special care to apply Virginia law on the subject, it cannot be said that the Letter of Intent is anything more than an unenforceable "agreement to agree." As a matter of law, the language used in the Letter of Intent fails to establish a 'meeting of the minds,' and beyond that, fails because it was subject to a condition precedent which was never fulfilled. The Letter of Intent is an agreement to "engage in good faith negotiations," precisely the type of "agreement to agree" that is invalid under Virginia law.

### 1. No Mutuality of Contract

The Letter of Intent contains an introductory paragraph and eight different numbered sections. It was initially drafted by VPEM, although both EQT and VPEM participated in minor revisions after the initial drafting.[7] The final draft is on EQT letterhead. In the Letter of Intent, the parties discuss VPEM's proposed purchase of capacity release from EQT's capacity on TGP's pipeline. They describe the terms of a future transaction in which the capacity will be released for a renewable term of three years, and the demand rate will be the lesser of $.84 per

---

[7] While not necessary to the analysis herein, under Virginia law, "[i]n the event of ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement." Martin & Martin, Inc. v. Bradley Enters., Inc., 256 Va. 288, 291 (1998).

dekatherm or the rate applicable to EQT under the NLRA. They provide that the release will be non-biddable and will comply with all FERC rules and regulations. The parties also agreed, that, during the term of the Letter of Intent, neither would enter into another agreement releasing the capacity covered by the contemplated transaction, that each party would bear its own costs and expenses, that the agreement would not be binding, that the agreement would be governed by Virginia law, and that any rights or obligations under the Letter of Intent were not assignable.

In interpreting the parties' language, "the Court must give effect to all of the contract's language if its parts can be read together without conflict . . . where possible, therefore, meaning must be given to every clause . . . however inartfully the contract may have been drawn, courts are not free to make a new contract for the parties but must construe the contract's language as written." SunTrust Mortg., Inc. v. AIG United Guar. Corp., 784 F. Supp. 2d 585 (E.D. Va. 2011).

Numerous parts of the Letter of Intent demonstrate that the parties contemplated the possibility that the future transaction discussed therein might not ever come to fruition. First, in the introduction, the parties state:

> Virginia Power Energy Marketing, Inc. ("VPEM, Replacement Shipper") and EQT Energy, LLC ("EQT") have been in good faith negotiations and intend to enter into the contractual

13

arrangement ("Transaction") described in this Letter of Intent ("LOI"). However, the parties are unable to execute the documents implementing the Transaction at this time . . . Therefore, VPEM and EQT are entering into this LOI which will bind both parties to execute all necessary documents and enter into this Transaction unless such action is excused by the express provisions of this LOI. This LOI sets forth the terms of this Transaction and the requirements of each of the parties regarding this Transaction.

The introduction explains: (1) that the parties cannot enter into the transaction; (2) that they intend to enter into it in the future; and (3) that there are certain "express provisions" of the Letter of Intent that will excuse the parties from any obligation to execute the future transaction. Second, ¶ 4 contains the following language: "regardless of whether the Transaction is implemented, each party will bear its own costs and expenses in connection with this LOI and this Transaction." (emphasis added). Here, the parties indicated that the transaction might not take place through the "regardless" clause and through the provision requiring each party to pay its own costs and expenses.

Third, ¶ 5 is labeled "Non-Binding Effect." Labels such as this, while not controlling, are helpful in determining the parties' intent. See Donnelly v. Donatelli & Klein, Inc., 519 S.E.2d 133, 138 (Va. 1999). The choice to write a separate, distinct paragraph, one of eight paragraphs in the Letter of Intent, entitled "Non-Binding Effect," must have some meaning.

The parties must have contemplated that at least some provisions of the Letter of Intent would not be binding.

Fourth, in the last sentence of ¶ 5, the parties appear to have agreed that, if the transaction were to be executed, the terms of the contract executing the transaction, rather than the terms of the Letter of Intent, would control.[8]

---

[8] The terms of ¶ 5 are confusing.  The paragraph provides:

> Except as otherwise indicated in this section, the parties will proceed to negotiate documents and enter into this Transaction. However, the parties will not be required to enter into this Transaction, and this LOI will terminate, immediately upon any of the following events.
> A. The parties execute the necessary documents and enter into this Transaction.

(emphasis added).

The last sentence of the paragraph is separated from the rest of the paragraph and provides, "[i]n all cases, this LOI will terminate and cease to have any continuing legal effect."

Giving every word in this paragraph meaning as the Court must, the reader is left to wonder exactly the parties may have meant.  The second sentence clearly indicates that the parties will not "be required to enter into the transaction."  However, it then continues on to explain that the Letter of Intent will terminate if "any of the following events" take place.  Only one "event" is listed.  And, that event is the execution of the transaction.  Finally, the last sentence provides for the termination of the Letter of Intent "in all cases," but no "cases" are actually identified.

Although not relevant to the Court's findings, it is difficult to believe that two sophisticated parties would so cavalierly have agreed to bind themselves to a multi-million dollar agreement with language as nonsensical as the language in ¶ 5.

15

Fifth, even if the Court were to completely disregard the introduction, the language in ¶ 4, and the label and language in ¶ 5, it could not ignore the clear meaning of ¶ 3.  Paragraph 3 serves as the basis for Count II of VPEM's complaint, breach of contract for violation of the exclusive dealing provision in the Letter of Intent.  The paragraph is labeled "Exclusive Dealing."  It provides, in pertinent part:

> During the term of this LOI, (i) EQT will not seek to entertain other offers for the capacity covered in this Transaction and will not enter into any agreement releasing the capacity covered by this Transaction to any other party, and (ii) VPEM will not seek or entertain other offers for alternatives to the capacity covered by this Transaction.  EQT and VPEM will negotiate in good faith to promptly draft and agree to all contracts and documents necessary to implement this Transaction.  EQT and VPEM will put forth good faith, diligent efforts to get approval for this Transaction from their respective senior management and/or boards of directors as quickly as possible.

(emphasis added).

Paragraph 3 bound the parties not to negotiate with other parties regarding the capacity release during the term of the Letter of Intent.  The language therein establishes that the parties contemplated that, should the Letter of Intent cease to operate, the parties would again be able to freely negotiate.  Again, the Court must assume that the parties put the words "during the term of this LOI," at the beginning of the clause

purposefully, and that the words have meaning. The words demonstrate that the parties conceived of future negotiations with third parties for the same capacity release discussed in the Letter of Intent at the end of the term of that Letter, or, put another way, that the parties conceived that there were circumstances in which the Letter of Intent would cease to operate and the transaction would not go forward.

This is further underscored by the last sentences in ¶ 3, which set forth condition precedents to the execution of the transaction. Those sentences explain that the parties will "negotiate in good faith" to agree to future contracts and documents to which they must agree in order to conduct the transaction, and that they will put forth "good faith" efforts to get senior management to approve the transaction. An agreement to negotiate in good faith to enter into a future contract is unenforceable. Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485, 488, 493 (E.D. Va. 2002) ("The mere agreement to negotiate established by the Letter of Intent is precisely the type of agreement to agree that has consistently and uniformly been held unenforceable in Virginia.") (citations omitted); Boisseau v. Fuller, 30 S.E. 457, 458 (Va. 1898) (explaining that the words 'notes and papers to be drawn up as soon as convenient,' at the end of a contract made an otherwise

enforceable contract unenforceable because those words demonstrated that the contract was, in fact, not a contract at all).

And, even were the Court to overlook the sentence in which the parties agree to negotiate in good faith to agree in the future, it would not be able to ignore the final sentence in ¶ 3. An agreement which contains a condition precedent has no binding effect if the condition precedent does not occur. VPEM argues that senior management for both parties already had approved the Letter of Intent prior to its execution. However, the plain words of the contract belie that contention. For, if VPEM's argument had merit, and senior management for both EQT and VPEM already had approved the transaction, then the entire last sentence of ¶ 3 would be superfluous.

Rafferty's September 20 letter, explaining that senior management had not approved the Letter of Intent and that, unfortunately, the parties' good faith negotiations had broken down, tracks the language in ¶ 3. After Rafferty sent the letter, any obligations EQT had under the exclusive dealing provision terminated and EQT was free to negotiate with other parties. VPEM Mem. Supp. Summ. J. at 15.

VPEM relies on ¶ 2 to contest the argument that the Letter of Intent was just an "agreement to negotiate in good faith."

VPEM contends, that unlike in the cases cited by EQT in which essential terms are missing, all of the terms of VPEM and EQT's future transaction were outlined in detail in ¶ 2 of the Letter of Intent.  *See, e.g.,* W.J. Schafer Assocs., Inc. v. Cordant, Inc., 493 S.E.2d 512, 515 (Va. 1997) (finding that an agreement was not enforceable after noting that key terms like pricing and assurance of product availability were missing); Mullins v. Mingo & Lumber Co., 10 S.E.2d 492, 494 (Va. 1940) (noting that an enforceable agreement should describe "the nature and extent of the service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid").  Paragraph 2 sets out the terms of the proposed capacity release.  Included are details about the length of the contract, the quantity of the capacity release, the delivery location, and the demand, commodity, and fuel rates.

Although ¶ 2 is very detailed, its terms were "open" or subject to change.  VPEM has acknowledged as much.  Thus, at least some of the terms of ¶ 2 were yet "to be negotiated in good faith."  For example, the parties set the demand rate at the lesser of $.84 per dekatherm or the rate that would be applicable to EQT under the NLRA.  They also agreed that their transaction would comply with "all applicable FERC rules and regulations and the requirements of TGP's FERC Gas Tariff and release rates."

However, as a non-biddable agreement, the transaction between VPEM and EQT could only go forward if VPEM agreed to pay the maximum applicable rate as set out in the TGP FERC Gas Tariff. Both parties knew as much when they signed the Letter of Intent, and both parties were aware that, at the time the Letter of Intent was written, the maximum applicable rate had not yet been set. See, e.g. Briden Expert Rept. at 4; VPEM Opp. Summ. J. at 8; EQT Mem. Supp. Summ. J. at Exhibit D, Minnaugh Tr. 26. And, the parties were also aware that demand rates fluctuated. Yet, VPEM did not agree to pay the lesser of the maximum applicable rate or $.84. And, it did not agree to pay the lesser of the maximum applicable rate or the rate that would be applicable to EQT under the NLRA.

Instead, it agreed to pay no more than $.84 per dekatherm. It now argues that it would have been willing to pay whatever the maximum applicable rate was on November 1. But, that is not what is written in the contract. When asked whether EQT could have enforced the $.88 per dekatherm rate against VPEM without VPEM's consent, Minnaugh, the point-person for VPEM with respect to all of the negotiations involving the Letter of Intent, said, "No." EQT Mem. Supp. Summ. J. at Exhibit D, Minnaugh Tr. 24. He said, "[in order for EQT to enforce a rate of $.88 per dekatherm], [b]oth parties would have to agree that VPEM would have to pay more, four more cents [than the rate in the Letter of Intent]."

20

Id.  In other words, the parties would have had to execute another agreement, which either party could have refused to accept, setting the rate at $.88 per dekatherm.

VPEM responds to this argument by presenting an alternative that is no less availing.  VPEM suggests that EQT could have "substituted performance" by changing the nature of the transaction so that it was a "biddable release."  VPEM Mem. Opp. Summ. J. at 14.  In that case, VPEM explains that it would have bid $.84 per dekatherm, pursuant to the terms of the Letter of Intent, and then, EQT would have been free to reject VPEM's bid and to accept whichever party made the highest bid.  Id.  Again, this scenario would require an entirely new contract or agreement. The Court would have to completely rewrite the Letter of Intent to make what was non-biddable biddable and to set up the conditions for the biddable release.  This type of wholesale reformation ventures far beyond the province of the judiciary.

At the time the Letter of Intent was drafted, VPEM agreed to pay no more than $.84 per dekatherm because the Letter of Intent was a draft of what was to be a future agreement.  EQT renounced the Letter of Intent prior to the execution of the contract due to the failure of a condition precedent.  As a result, the parties never completed their negotiations with respect to demand rate and other open terms, and a contract between them was never formed.

One other provision in the Letter of Intent underscores the foregoing conclusions.  That provision is contained in ¶ 4 of the agreement, labeled "Costs."  The lack of remedy for breach in an agreement is evidence that the parties did not intend to be bound by it.  Burbach Broad. Co. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002) ("Some preliminary agreements are simply not capable of creating binding obligations . . . [w]hen terms are so vague and indefinite that there is no basis or standard for deciding whether the agreement has been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.").

In ¶ 4, the parties agreed that the Letter of Intent would create no cause of action for damages.  That paragraph reads as follows:

> Regardless of whether the Transaction is implemented, each party will bear its own costs and expenses in connection with this LOI and this Transaction.  Except as may otherwise be agreed in writing, in no event will any party be liable to any other party for any costs or expenses otherwise incurred by such other party, OR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, OR EXEMPLARY DAMAGES OR LOSS OF PROSPECTIVE PROFITS.

(emphasis added).

VPEM argues that this paragraph does provide a remedy for breach inasmuch as it does not specifically exclude "direct

damages." Although ¶ 4 does not use that term, it does provide that neither party will be liable to any other party "for any costs or expenses otherwise incurred by such other party." Considered in context, that phrase would include direct damages for breach of contract because in the ensuing clause the parties exclude liability for all measures of indirect damages, the other kind of damages conceptually recoverable for breach of contract.

In sum, when the Letter of Intent is viewed as a whole and each part is given a reasonable construction, it is quite clear that the Letter of Intent is merely an agreement to agree which, under Virginia law, is not a contract. Hence, Count I of the Amended Complaint, a claim for breach of contract, fails as a matter of law for lack of its predicate: a contract.

## 2. Count II: Exclusive Dealing Provision

Neither party spends much time addressing Count II of VPEM's complaint. VPEM's motion for summary judgment is solely premised on Count I. EQT's motion, however, requests dismissal of all three counts of the Amended Complaint. (Docket No. 24). In Count II, VPEM alleges that EQT breached the "exclusive dealing provision" of the Letter of Intent, found in ¶ 3, which reads as follows:

> During the term of this LOI, (i) EQT will not
> seek to entertain other offers for the
> capacity covered in this Transaction and will
> not enter into any agreement releasing the

23

> capacity covered by this Transaction to any
> other party, and (ii) VPEM will not seek or
> entertain other offers for alternatives to the
> capacity covered by this Transaction.

Count II fails for the same reason that Count I did not survive summary judgment: The Letter of Intent is an agreement to agree and is not a contract. Hence, there is no predicate for the breach of contract that is alleged in Count II.

### 3. Count III: Estoppel

In Count III of its Amended Complaint, VPEM alleges that EQT should be estopped from denying that the Letter of Intent is contractually binding because, in the Letter of Intent and in its verbal communications with VPEM, EQT represented that it intended to be bound by the Letter of Intent. ¶¶ 34-39. VPEM, however, has provided no authority that equitable estoppel is a cause of action under Virginia law. In Virginia, "there is no recognized cause of action for [equitable] estoppel," and the doctrine is usually asserted as a "shield" rather than a "sword." Parker v. Westat, Inc., 301 F. Supp. 2d 537, 544 (E.D. Va. 2004) (citing Meriweather Mowing Serv. v. St. Anne's-Belfield, Inc., 51 Va. Cir. 517, 519, 2000 WL 33259936 (Va. Cir. 2000)); Best Med. Int'l, Inc. v. Eckert & Ziegler Nuclitec GmbH, No. 1:10cv617, 2011 U.S. Dist. LEXIS 1003232, at *6 (E.D. Va. Sept. 7, 2011) ("[T]here is no affirmative cause of action for estoppel under Virginia law . . . Virginia courts have stated that equitable estoppel usually

24

operates as a shield rather than a sword, and therefore does not of itself create a new right.") (quoting Meriweather, 51 Va. Cir. At 519); Thomas v. Wells Fargo Bank, N.A., No. 4:10cv0060, 2011 U.S. Dist. LEXIS 52399, at *6 (W.D. Va. May 17, 2011) (noting that the doctrine of equitable estoppel constitutes an "affirmative defense[] and not [a] cause[] of action") (quoting Parker, 301 F. Supp. 2d at 544). On December 16, 2011, the Court granted EQT's motion to dismiss Count III for failure to state a claim upon which relief could be granted. (Docket No. 19). However, the Court permitted VPEM to file an amended complaint and explained that the December 19 Order was "without prejudice to the assertion of principles of estoppel by the plaintiff as respects any defensive position asserted herein by the defendant." Id. VPEM then filed the Amended Complaint in which it altered Count III slightly, deleting the request for damages therein and asserting estoppel once again as an affirmative claim.

VPEM's amendment failed to comply with the Court's Order in that estoppel remained a separate cause of action. VPEM is clearly attempting to use equitable estoppel as a "sword" and not as a "shield," and it has not explained how that can be done under Virginia law.

At oral argument, VPEM's counsel asserted that Count III, in reality, was an affirmative defense and then suggested that Count

III also presented a claim for declaratory relief predicated on the doctrine of equitable estoppel. Passing over for a moment the fact that the Amended Complaint is an improper place to posit an affirmative defense, and that Count III does not remotely resemble a plea for declaratory judgment, VPEM's estoppel theory fails because it has not been established in the least.[9]

To present the defense of equitable estoppel, it is VPEM's burden to show by "clear, precise, and unequivocal evidence" that:

> (1) A material fact was falsely represented or concealed;
> (2) The representation or concealment was made with knowledge of the facts;
> (3) The party to whom the representation was made was ignorant of the truth of the matter;
> (4) The representation was made with the intention that the other party should act on it;
> (5) The other party was induced to act upon it; and
> (6) The party claiming estoppel was misled to his injury.

VPEM has not offered sufficient proof to show that EQT falsely represented that the Letter of Intent was "contractually binding," nor has it offered proof that "it [VPEM] was ignorant of the truth of the matter." Finally, VPEM has not shown that it "was misled to [its] injury." Even interpreting all the evidence in the light most favorable to VPEM, VPEM has not shown this last

---

[9] Estoppel is never to be applied upon an uncertain or speculative state of facts. Repass v. Richmond, 99 Va. 508 (1901).

required element of equitable estoppel.   In its opposition to EQT's motion for summary judgment, VPEM says the following:

> VPEM has not sought damages related to hedging activity, financial transactions, or third party agreements entered into in reliance on the existence of the LOI.   While VPEM did rely on the existence of the LOI in making business and financial decisions to its detriment, VPEM does not seek damages to compensate it for those activities.   Instead, VPEM seeks direct damages it suffered as a result of EQT's anticipatory breach of contract. Specifically, VPEM seeks compensation equal to the value of the LOI on the date that EQT repudiated it.

VPEM Mem. Opp. Summ. J. at 4.

In other words, VPEM is not claiming damages for anything other than EQT's failure to perform the contract contemplated by the Letter of Intent.   VPEM specifically explains that it is not asking for damages based on its detrimental reliance.   Even had EQT represented that the contract was "binding," (in support of which VPEM has not offered a single example), there is no evidence that this representation "injured" VPEM.

For these reasons, Count III fails as a matter of law as well.

27

**CONCLUSION**

For the foregoing reasons, the MOTION FOR SUMMARY JUDGMENT AS TO COUNT I (BREACH OF CONTRACT) OF THE AMENDED COMPLAINT (Docket No. 61) filed by VPEM will be denied, EQT Energy, LLC's ("EQT") MOTION FOR SUMMARY JUDGMENT (Docket No. 67) will be granted, and VPEM's Amended Complaint will be dismissed with prejudice.

It is so ORDERED.

/s/         REP
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 15, 2011